IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAUL LAVOIE                              )
                                         )
            Plaintiff,                   )
                                         )     No. 13 C 2560
v.                                       )
                                         )     Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Paul Lavoie has filed a motion (doc. # 18) to reverse or remand the final determination by the Commissioner of Social Security ("Commissioner"), denying his application for Disability Insurance Benefits ("DIB"). The Commissioner has responded, seeking affirmance of the decision denying benefits (doc. # 29) and Mr. Lavoie has filed a reply (doc. # 34). For the following reasons, the Court grants the claimant's motion to remand and denies the Commissioner's motion.

## I.

On September 23, 2009, Mr. Lavoie applied for DIB, alleging a disability onset date of October 17, 1998 (R. 47-48). His last-insured date was September 30, 2003 (R. 13). Mr. Lavoie's claim was denied initially and upon reconsideration, and a hearing was held before an ALJ on December 28, 2011 (R. 11). In a written opinion issued on January 12, 2012, the ALJ concluded that Mr. Lavoie was not disabled during the time period between his alleged onset date and his

---

[1]On April 17, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 8).

date last insured (R. 11-20). The Appeals Council denied Mr. Lavoie's request for review of the ALJ's decision (R. 4-6), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. We review Mr. Lavoie's general background and medical record in Part A;[2] the hearing testimony in Part B; and the ALJ's written opinion in Part C.

## A.

Mr. Lavoie was born on February 16, 1956. He was 42 years old at his alleged onset date, 47 years old on his date last insured, and 55 years old at the hearing. Mr. Lavoie has a high school education that consisted of "special education" classes, but the record shows no formal diagnosis of a learning disability (R. 14, 86). Between 1992 and his alleged onset date, Mr. Lavoie worked for various grocery stores as a stocker and a meat wrapper and held several temporary laborer jobs as a material handler and forklift driver (R. 56-59, 220-222). Mr. Lavoie did not work at all in 1998, the year of his alleged onset date; he held several temporary jobs in 1999 including one he quit after five weeks because it was "too hot" (R. 50-52, 221). He has not worked since 1999.[3]

Medical records from Tinley Park Hospital in October 1998 report that on October 12, 1998, Mr. Lavoie's sister took him to South Suburban Hospital because his blood pressure was

---

[2]A large part of the 700-plus page record in this case consists of medical records for visits Mr. Lavoie made to Oak Forest Hospital after his date last insured, that is, after September 30, 2003. Because we need to determine whether Mr. Lavoie was disabled prior to his date last insured, we will focus our summary of Mr. Lavoie's medical history on the time period between his alleged onset date and his date last insured, referencing later events only to the extent they are relevant to the question of whether he was disabled during the claims period.

[3]At two medical appointments in May and June 2001, Mr. Lavoie reported fatigue because he was working a lot (R. 727, 729). However, the SSA's records of Mr. Lavoie's earnings do not reflect that he held a job or earned any money at all in 2001 (R. 222).

out of control and he had stopped taking his medications for diabetes, high cholesterol and depression (R. 312).[4] After spending several days at South Suburban Hospital, Mr. Lavoie was transferred to Tinley Park Hospital for inpatient treatment on October 16, 1998 because he was contemplating suicide; his diagnosis on admission to Tinley Park was "major depression – recurrent" (*Id.*).[5]

Mr. Lavoie remained at Tinley Park Hospital until November 13, 1998. During that time, his GAF score improved from 40 to 60,[6] and he was restarted on his medications for his diabetes (Glucopaz), high cholesterol (Leprid) and depression (Zoloft) (R. 313). At his discharge on November 13, 1998, Mr. Lavoie denied feeling depressed or suicidal and was assessed as having received the maximum benefit from in-patient psychiatric treatment (*Id.*). After his discharge, Mr. Lavoie began outpatient mental health therapy through the Metropolitan Family Services Center (R. 66, 70, 313). None of Mr. Lavoie's records from Metropolitan Family Services are available for review because they were destroyed by the facility as a matter of course prior to Mr. Lavoie's claim for benefits (R. 512). The record does not reveal how often or for how long Mr. Lavoie attended therapy sessions at Metropolitan Family Services.

---

[4] Mr. Lavoie did not produce any medical records from South Suburban Hospital (R. 65).

[5] During his stay at Tinley Park Hospital, Mr. Lavoie reported an earlier suicide attempt by drug overdose on September 5, 1998 that resulted in a two or three day stay at South Suburban Hospital (R. 316).

[6] The Global Assessment of Functioning (GAF) is a system used to score the severity of psychiatric illness. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/ (visited on January 5, 2015). A score of 40 is at the high end of having some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood, while a score of 60 is at the high end of having moderate symptoms or impairments. https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm (visited on January 5, 2015). We note that in 2012, the DSM V discontinued the use of the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013). *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing the discontinuation of use of the GAF scale after 2012).

During the time period between July 1999 until at least the date of the hearing, Mr. Lavoie visited the outpatient clinic at Oak Forest Hospital every three to six months to have his blood sugar and cholesterol levels checked (R. 632-749). The records from some of these clinic appointments mention Mr. Lavoie's mental state. For example, on June 24, 1999, he told a doctor that his depression had increased lately and that he had felt suicidal the previous day but did not act on his feelings; his affect at this appointment was judged to be "flat" (R. 741). Although he did not feel suicidal at the time of his actual clinic appointment, Mr. Lavoie told the doctor that if the feeling returned, he may not tell anyone (*Id.*, R. 742). Instead of going to the hospital after his appointment, Mr. Lavoie agreed to visit a crisis center with his sister; the record does not reveal if such a visit occurred (R. 742). At a follow-up appointment at the clinic on June 29, 1999, Mr. Lavoie promised to tell someone if he was feeling suicidal; his affect that day was judged to me "much brighter" (presumably than that of five days previously) (R. 740). He also agreed to meet with a new social worker at Metropolitan Family Services (*Id.*).

In August 1999, Mr. Lavoie reported no suicidal thoughts (R. 738). On October 12, 1999, his medical record from Oak Forest Hospital noted "depression" and recommended a follow up appointment. In December 1999, he reported that he was doing "okay" and that he had begun working for a temporary agency (R. 736). The medical record from his next appointment at Oak Forest Hospital, from February 2000, notes that he was "not feeling suicidal" although he expressed frustration with his temporary work (R. 734).

The record contains no other references to Mr. Lavoie's mental state prior to his date last insured. The next medical record concerning Mr. Lavoie's mental health status is from October 31, 2005, when Mr. Lavoie was referred to the psychiatry clinic at Oak Forest Hospital; the referral form stated that Mr. Lavoie had depression and was "failing on a high dose of Zoloft"

(R. 508). Mr. Lavoie reported to his psychiatrist, Samina Khattak, M.D., that he had been depressed for the "past 7-8 years" and that he still had periods of depression that lasted a week or two at a time, as well as "passive suicidal thoughts" that he should not have been born and that he should not be here (Id.). Mr. Lavoie continued to receive mental health treatment from Dr. Khattak and later from psychologist John Canzona, Psy.D (R. 329-345, 407-482, 573-603).

With respect to his physical health, Mr. Lavoie's treatment consisted primarily of visits to the Oak Forest Hospital outpatient clinic for bloodwork and medication management (R. 632-749). At these appointments, he regularly reported being non-compliant with the diet prescribed for his diabetes, but there is no evidence that he needed any additional treatment with respect to his diabetes because of non-compliance (R. 734-39). Mr. Lavoie complained of ankle pain at an appointment in May 2002 and wore a brace in June 2002 because of ankle instability; the record does not reveal how long Mr. Lavoie wore the brace, but he did not complain of ankle problems at later appointments (R. 673, 74).[7]

On February 23, 2010, Donald Henson, Ph.D, reviewed Mr. Lavoie's mental health history as part of his claim for benefits and filled out a psychiatric review form (R. 360-72). Dr. Henson found insufficient evidence of Mr. Lavoie's mental status prior to his date last insured to make any sort of recommendation about his residual functional capacity ("RFC") or diagnosis during the claims period (October 17, 1998 to September 30, 2003) (Id.). Dr. Henson did not review any records for the period prior to Mr. Lavoie's date last insured, and did not review post-date-last-insured records from before 2009 (Id.). He also gave no opinion about Mr. Lavoie's mental state for the period of time for which he did have medical records. On February 25, 2010,

---

[7]The ALJ also refers to treatment Mr. Lavoie underwent in early 2002 for a "foot lesion", but a review of the record pages the ALJ cites only reveals that Mr. Lavoie did not have any foot lesions at the time, not that he had ever been treated for one (R. 673-75).

5

based on a review of the same records, C.A. Gotway, M.D., confirmed Dr. Henson's assessment stating that there was no medical evidence from prior to February 2007 (R. 375-76).

On November 23, 2011, Dr. Khattak (who had treated Mr. Lavoie from October 2005 onward) completed a mental RFC questionnaire for Mr. Lavoie (R. 621-25). Dr. Khattak diagnosed Mr. Lavoie with "bi-polar disorder – recurrent depressed" and noted that he had "poor coping skills, anxiety, mood swings," and that he had almost no ability to function in a normal work environment (*Id.*). Dr. Khattak characterized Mr. Lavoie as having "chronic mental illness" but did not specifically opine about when his limitations first occurred, and, in particular, whether they existed before October 2003 (R. 624).

At the same time, Dr. Simon Piller, one of the internists who had seen Mr. Lavoie at the Oak Forest clinic every three to four months since 2005, completed a physical RFC questionnaire diagnosing Mr. Lavoie with type II diabetes, bi-polar disorder, morbid obesity and degenerative joint disease in both knees (R. 627-30).[8] Dr. Piller assessed Mr. Lavoie's prognosis as "guarded" and opined that he would be incapable of tolerating even a low stress job because of his psychological disorder (*Id.*). Like Dr. Khattak, Dr. Piller did not opine as to the onset date of these restrictions.

## B.

At the hearing, Mr. Lavoie (assisted by a non-attorney representative), Mr. Lavoie's sister, and a vocational expert ("VE") testified. Mr. Lavoie testified that during the claims period, it was difficult for him to get a job because of his limited education (R. 74). He testified that with respect to his depression, he experienced two to four "bad days" per week and that he thought about suicide during those times (R. 82). Mr. Lavoie testified that he had tried to commit suicide

---

[8]There is no evidence that an agency doctor ever reviewed Mr. Lavoie's physical health history or records to determine a physical RFC.

in part because he was frustrated by his inability to get a job and his inability to understand some of the job applications he encountered (R. 66). His sister testified that after Mr. Lavoie lost a long-term job when American Can had closed in the early 1990s, he had become more depressed about his failure to find another job he liked and could do (R. 93-94). Mr. Lavoie's sister also described some of Mr. Lavoie's mental health treatment during the claims period, explaining that he received mental health therapy from Metropolitan Family Services for a "couple of years" and then began visiting the Robins Health Clinic until he received a psychiatric referral to the Oak Forest Clinic because Robins did not provide that type of treatment (R. 88-89). She did not know the specific facts concerning the referral from Robins or the name of the doctor who made the referral (*Id.*).

Mr. Lavoie testified that he quit one of his temporary positions in 1999 because of the heat (R. 50-51). Since then, he has been able to take care of his basic daily needs, cook for himself, and take care of the yard work at the house he shared with his mother (*Id.*, R. 75). Mr. Lavoie drove, did the grocery shopping and enjoyed photography and occasional bike riding as well (R. 76-78).

At the hearing, the ALJ asked the vocational expert to assume a hypothetical claimant who could perform a job with medium exertional demands who was limited to simple, routine and repetitive tasks with only occasional decision making requirements and with relaxed or flexible production requirements (R. 99). The VE testified that with that hypothetical, Mr. Lavoie would be able to perform his past job as a meat wrapper and stocker (*Id.*). When the ALJ added the limitation that the hypothetical claimant could not interact on a sustained basis with the public or co-workers, the VE testified that the job of meat wrapper was still available (R. 100).

## C.

On January 12, 2012, the ALJ issued a written opinion finding Mr. Lavoie not disabled (R. 11-20). In evaluating Mr. Lavoie's claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. §404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ found that although Mr. Lavoie had worked at several temporary jobs in 1999, he did not earn enough money for the work to be considered substantial gainful activity. Therefore, the ALJ determined that between February 1, 1998[9] and September 30, 2003, Mr. Lavoie did not engage in substantial gainful employment (R. 13).

At Step 2, he found that Mr. Lavoie had the severe impairments of depression and diabetes mellitus (*Id.*). The ALJ specifically noted that the record also supported a finding that Mr. Lavoie was obese, had high cholesterol and had a history of high blood pressure prior to his date last insured, but that these impairments did not cause more than minimal functional limitations and were therefore considered non-severe (*Id.*).[10]

At Step 3, the ALJ ruled that there were no clinical signs or findings that Mr. Lavoie had an impairment that met or medically equaled the severity of any listed impairment, including

---

[9]At the hearing, Mr. Lavoie amended his onset date to October 17, 1998; the ALJ erroneously referred to his earlier onset date. The error does not affect our analysis but should be corrected by the ALJ on remand.

[10]Although Mr. Lavoie and his sister both also testified about lifelong problems Mr. Lavoie had with his legs, and the record contains a number of pieces of evidence concerning knee pain, claimant does not argue that problems with his knees rose to the level of a severe impairment during the claims period.

Listings 9.00 (diabetes) and 12.04 (mental impairments) (R. 14). Specifically, he found that Mr. Lavoie's diabetes did not cause end-organ damage prior to his date last insured (R. 14).

With respect to Mr. Lavoie's mental impairment, the ALJ considered the so-called "Paragraph B" and "Paragraph C" criteria in the Social Security Administration's listings of mental impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically listings § 12.04 (affective disorders) (R. 14).[11] The ALJ found that Mr. Lavoie had no restriction in his activities of daily living during the claims period, as evidenced by his testimony that he cooked, bathed himself, drove and did yard work (*Id.*). Mr. Lavoie had mild difficulties in social functioning, based on his sister's testimony that he mostly kept to himself; the ALJ found no evidence that Mr. Lavoie had trouble interacting with authority figures or members of the public (*Id.*). Mr. Lavoie's description of having trouble understanding things and the fact that he had taken special education classes at school supported a finding that he had moderate difficulties with concentration, persistence and pace (*Id.*). Finally, his psychiatric hospitalization in October and November 1998 constituted his only period of decompensation, so Mr. Lavoie did not experience repeated episodes of decompensation under Paragraph B or C criteria (R. 15).

The ALJ next determined that prior to his date last insured, Mr. Lavoie had the RFC to perform medium work, except that he was limited to work that did not involve any more than simple, routine and repetitive tasks (R. 16). To account for Mr. Lavoie's diabetes, the ALJ limited Mr. Lavoie to medium work. To account for his depression, the ALJ limited his RFC to

---

[11] To meet the Listing for a mental impairment under Paragraph B, a claimant must have at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each for extended duration. Under Paragraph C, there must be evidence of episodes of decompensation for extended duration and evidence that even a minimal increase in mental demands or change in the environment could cause the individual to decompensate. http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_07 (visited on December 30, 2014).

9

work that did not involve more than occasional decision-making and that allowed for a flexible production rate within the work shift (R. 18).

In supporting his RFC determination, the ALJ found that while Mr. Lavoie's impairments could reasonably be expected to cause his pain and other symptoms. Mr. Lavoie's testimony about the intensity, persistence and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 16-17). The ALJ did not describe what parts of Mr. Lavoie's testimony he found not credible. Instead, with respect to Mr. Lavoie's mental health symptoms, the ALJ noted that during his October 1998 psychiatric hospitalization, Mr. Lavoie's mental health improved from a GAF score of 40 to 60 and that at discharge, he denied feeling depressed or suicidal (R. 17). The ALJ mentioned that Mr. Lavoie reported feeling suicidal in June 1999, but that Mr. Lavoie's affect was also "much brighter" in June 1999 (*Id.*). He noted that Mr. Lavoie sought treatment from Metropolitan Family Services but that their records had been destroyed. The ALJ also noted that Mr. Lavoie was mentally capable of performing temporary work in 1999 and that he quit at least one of those jobs because it was too hot (*Id.*, R. 19).

The ALJ also described the difficulties he faced trying to adduce specific information from Mr. Lavoie about his impairments (R. 19). During the hearing, Mr. Lavoie was unable to tell the ALJ how old he was at his onset date, could not describe a typical day during the claims period,[12] and could not remember the names of some of his medications (*Id.*). The ALJ also said he found it "interesting" (without further explanation) that Mr. Lavoie claimed that his

---

[12]Mr. Lavoie did answer a number of questions about his activities during the claims period. When the ALJ specifically asked him, "what was a typical day like for you . . . between October of '98 and September of 2003? If you recall.", Mr. Lavoie replied "No, I don't."

educational limitations prevented him from looking for anything other than factory work, but nonetheless sought vocational rehabilitation services (*Id.*).

With respect to Mr. Lavoie's physical impairments, the ALJ considered Mr. Lavoie's treatment for diabetes and high cholesterol. He specifically mentioned evidence in the record that Mr. Lavoie visited various health clinics on a regular basis and noted (incorrectly) that he had treatment for a lesion on his foot in 2002 (R. 18, 19). The ALJ found that that Mr. Lavoie had no other problems related to his diabetes, and that he was not compliant with his diet prescribed for his diabetes (*Id.*). The ALJ noted that there was no record evidence that Mr. Lavoie had difficulties walking and also mentioned that in 2002, Mr. Lavoie used a brace on one of his ankles because of instability but did not report additional ankle problems prior to his date last insured (*Id.*).

In considering the opinions of medical experts, the ALJ gave little weight to the state agency psychological consultants who had concluded there was insufficient evidence of a mental impairment during the claims period to make an RFC determination, because these experts did not review any of Mr. Lavoie's relevant mental health records (R. 18). The ALJ noted evidence about Mr. Lavoie's mental health during the claims period was produced at the hearing and that he considered it in making his RFC determination (R. *Id.*). The ALJ gave no weight to the opinions of Drs. Piller and Khattak because neither of them treated Mr. Lavoie during the claims period (*Id.*).[13]

---

[13]The ALJ stated that Dr. Piller did not begin treating Mr. Lavoie until February 2007; however Dr. Piller himself reported in his RFC questionnaire that he begin seeing Mr. Lavoie two years earlier, in February 2005 (R. 627).

## III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ must build "an accurate and logical bridge" from the evidence to his conclusion, but is not required to mention or consider every piece of evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Mr. Lavoie argues that the ALJ failed to adequately support both his assessment of Mr. Lavoie's RFC as it related to his depression and his physical limitations, and his credibility findings (Pl.'s Mem., doc. # 18, at 1). Mr. Lavoie contends that after rejecting all of the medical opinions in the record, the ALJ did not provide an adequate basis for his specific RFC findings (*Id.*).

## A.

An ALJ may reject the medical opinions in the record when none of the doctors provide medically acceptable evidence to support their positions. *See* 20 C.F.R. § 404.1526, 416.926. But in such a case, the ALJ may not substitute his own medical opinion for that of the opinions in the record when determining the RFC. *See Scivally v. Sullivan, M.D.*, 966 F.2d. 1070, 1077 (7th Cir. 1992). Instead, when an ALJ rejects a medical opinion or opinions, he or she must rely on other medical evidence or authority in the record to support the RFC determination. *Collins v. Astrue*, 324 F. App'x 516, 521 (7th Cir. 2009).

We recognize that the agency doctors' opinions failed to review any of the relevant medical records from the claims period, or for that matter, for any time period prior to 2009. The ALJ thus acted well within his discretion to discount these opinions on that basis. But then, despite having no medical opinions as to Mr. Lavoie's alleged impairments during the relevant time period, the ALJ did not arrive at an RFC based on "other medical evidence or authority." Rather, after a cursory recitation of the medical documents, the ALJ concluded that there was "no support in the record for the claimant's statements regarding severe depression that lasted several days at a time" (R. 19).

In fact, there is medical evidence that supports Mr. Lavoie's testimony about his depression. The medical records show that Mr. Lavoie was diagnosed as having recurrent major depression in 1998 when he attempted suicide, and that he reported feeling suicidal again in 1999 (notably at the same time that he was unsuccessfully attempting to hold down a job). To arrive at his RFC, the ALJ must have determined that prior to September 30, 2003, Mr. Lavoie's major depression was sufficiently under control to permit him to perform the varied types of work the RFC could suggest. And, indeed, the ALJ remarked on Mr. Lavoie's elevated GAF score (from 40 to 60) immediately upon his discharge from four weeks of in-patient psychiatric care in 1998, and a statement in a medical record that Mr. Lavoie's affect was "much brighter" in June 1999 – the same month in which the records show he was also feeling suicidal.

That is an exceedingly slim foundation on which to conclude that the major depression Mr. Lavoie was hospitalized for in October 1998 was fully under control by September 30, 2003. Indeed, there is other evidence in the record, which the ALJ failed to grapple with, suggesting the contrary. For example, there is evidence that Mr. Lavoie participated in regular therapy

sessions throughout the claims period and thereafter, including up to the time of the hearing.[14] In 2005, four years before he filed this disability claim, Mr. Lavoie told several doctors that he had regular multi-day periods of depression going back at least seven or eight years and his longtime treating psychiatrist characterized his mental illness as chronic. Moreover, in 2005, a high dosage of Zoloft (an anti-depressant that requires a doctor's prescription and oversight to obtain, and which Mr. Lavoie had been taking at least since 1998), was not effective to control his depression.

In the face of this evidence, the ALJ's conclusion that the record contains "no support" for Mr. Lavoie's claims requires considerably more explanation than he provides. In the absence of medical evidence, the ALJ should have further developed the record by engaging an Agency expert to review Mr. Lavoie's health records from the claims period. *Richards v. Astrue,*, 370 F. App'x 727, 731 (7th Cir. 2010) ("the ALJ 'has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.'" (quoting *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004). Without an explanation about how he determined Mr. Lavoie's RFC, we can only conclude that the ALJ substituted his own judgment about Mr. Lavoie's medical condition for that of a medical expert.[15]

---

[14]While it is unfortunate that Mr. Lavoie's medical records from Metropolitan Family Services were destroyed, the ALJ did not question that the treatment occurred during that time period.

[15]We recognize that although Mr. Lavoie visited the Oak Forest Hospital outpatient clinic on a bi-monthly basis for bloodwork related to his diabetes and high cholesterol and other physical issues and medication refills, the records after early 2000 do not reflect any discussion about Mr. Lavoie's mental health or suicidal ideations. While such an absence might indicate that Mr. Lavoie was not experiencing mental health difficulties during the second half of the claims period, it also might indicate is equally reasonable to infer that Mr. Lavoie's mental health needs were being addressed elsewhere and the rotating cast of treaters at the clinic – who were focused on Mr. Lavoie's physical condition – were not aware of his mental health history so as to question him at every appointment. Given Mr. Lavoie's documented difficulties communicating, it also might be the case that he simply did not report about his mental state unless directly asked. It is the role of the ALJ on remand to determine the significance – if any – of Mr. Lavoie's failure to report mental health difficulties to the Oak Forest clinic between early 2000 and his date last insured.

In addition, the ALJ should not have rejected the opinions of Mr. Lavoie's treating doctors solely because they did not treat Mr. Lavoie during the claims period. We recognize that neither Dr. Khattak nor Dr. Piller gave an opinion on whether the limitations they ascribed to Mr. Lavoie after they began treating him in 2005 existed prior to October 2003. That said, the underlying conditions they described were not ones that emerged only after September 2003. Rather, Drs. Khattak and Piller diagnosed the same conditions – recurrent, chronic depression and diabetes – that Mr. Lavoie had going back to 1998. *Freismuth v. Astrue*, 920 F. Supp. 2d 943, 951 (E.D. Wis. 2013), *citing Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) (The opinions of treating physicians should be given weight if they are corroborated by evidence from the insured period, even if they were not rendered before the date last insured). Medical opinion evidence should have been adduced as to whether Mr. Lavoie's condition in 2005 shed light on whether he was disabled as of September 2003.

Based on this analysis, we will remand the case for further consideration. In doing so, we fully acknowledge that a number of factors complicated the ALJ's job. He had to contend with a discrete claims period that closed almost eight years before the hearing began. Much of the medical evidence most likely to be relevant to his analysis (in particular, the records from Metropolitan Family Services) was unavailable through no apparent fault of either party. The claimant's testimony was difficult to follow, despite the efforts of both the ALJ and the claimant's representative to adduce more specific information. And the agency medical experts who reviewed the claimant's file inexplicably did not have any of Mr. Lavoie's mental health documents from prior to 2009 before them. We hope that the guidance in this opinion will assist the ALJ in overcoming these hurdles in reaching his decision on remand.

## CONCLUSION

For the reasons stated above, we grant Mr. Lavoie's motion to reverse and remand the ALJ's decision (doc. #18) and we deny the Commissioner's motion to affirm the denial of benefits (doc. #29). This case is remanded for further proceedings consistent with this ruling.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED: January 27, 2015